Fred D. Wead et al., Appellees, v. Ernest Ganzhorn et al., Appellants.

No. 41950.

June 20, 1933.

C. W. Kellogg, and John A. McKenzie, for appellants.

Baird & Baird, for appellees Fred D. Wead and H. Malcolm Baldrige.

J. Gerald MacVeigh, for appellees J. A. Youngstrom and Don H. Moore.

Kintzinger, J.—This is an action brought by the plaintiffs as assignees to recover on five promissory notes of $500 each and the foreclosure of a mortgage securing the same. Defendants Moore and J. A. Youngstrom were also brought in by cross-petition; and Moore asks judgment on three notes held by him as assignee aggregating $1,100 and the foreclosure of the mortgage which also secured them. Youngstrom denies the allegations of fraud in his answer but asks no judgment.

The notes and mortgage were originally executed to one J. A. Youngstrom who assigned and transferred them to plaintiffs for a

valuable consideration, before their maturity. The instruments in question were part of a series of notes executed by the defendants Ganzhorns for the purchase of $14,200 worth of stock in the American Business College of Omaha, Nebraska. The capital stock of the college was $18,300 of which Mr. Youngstrom owned $13,600 and his wife $600, Mrs. Ganzhorn $3,000, and the balance by a Mrs. Bradford and various other small stockholders. The defendant Mrs. Ganzhorn and Mrs. Bradford purchased the $14,200 worth of stock owned by the Youngstroms for $8,000, giving their notes and $100 in cash in payment therefor. $4,000 of said notes were secured by the mortgage in question; the balance was unsecured.

The defendants contend that the notes and mortgage were procured by false and fraudulent representations as to the character and value of the business of the college.

The representations relied upon as constituting fraud are substantially as follows:

1. That the capital stock was all paid up in cash.

2. That the college had been earning 8 per cent interest, of which 6 per cent was paid in dividends and 2 per cent placed in the surplus.

3. That the principal assets of the college were $38,900 worth of student notes.

4. That the notes were good and would pay at least 75 per cent on the dollar, and were signed by financially responsible people, none of whom were minors.

5. That the notes were reasonably worth from $27,000 to $30,000.

The business college in question was taken over by the defendant and a Mrs. Bradford who purchased all of Mr. Youngstrom's stock in April, 1930.

Mrs. Ganzhorn testified that Mr. Youngstrom at the time she purchased the stock told her that the capital stock of $18,300 was paid up in cash; that the college had been earning 8 per cent interest from which they paid 6 per cent dividend and placed 2 per cent in the surplus; that the principal assets of the college were over $38,000 worth of student notes; that the notes were good and would pay at least 75 per cent on the dollar and were signed by financially responsible people none of whom were minors.

At the time Mrs. Ganzhorn and Mrs. Bradford purchased the stock they were already both stockholders and instructors in the col-

lege and taught bookkeeping therein. Mrs. Ganzhorn was connected with the college as a stockholder for three years during all of which time she owned $3,000 of its capital stock. Her stock was not all paid for and she still owed $1,500 thereon. Mrs. Bradford, her associate, had been a stockholder and teacher for five years prior to the time of taking over the college, and was connected with the college during all that time. Both were present in the college during all that time, attended all the stockholders' meetings, were experts in bookkeeping, had access to the books at all times and knew the enrollment, saw the students, and had equal means of information about the affairs of the college with Mr. Youngstrom.

It is the well-settled law in this state that where a person entering into a contract knows of the facts later complained of as fraud, or where they have equal opportunity of learning the matters so complained of, they cannot later be heard to say that they were ignorant thereof.

One of the necessary elements of "fraud" for which an action will lie, is that the false representations made were as to facts upon which defendant had a right to rely.

"A person to whom false representations are made is not entitled to relief because of them if he might readily have ascertained the truth by ordinary care and attention, and his failure to do so was the result of his own negligence. Hence, as a rule, in order that false representations may be ground for an action for deceit or for rescission of a contract entered into in reliance thereon, they must be such as are calculated to impose upon or deceive a person of ordinary prudence, and of such a character that a reasonably prudent person would have relied on them. In other words, where the means of knowledge are at hand and are equally available to both parties, and the subject matter is alike open to their inspection, if one of them does not avail himself of those means and opportunities, he will not be heard to say that he was deceived by the other's misrepresentations." 12 R. C. L. 371, section 123.

Bell v. Byerson, 11 Iowa 233, 77 Am. Dec. 142; Boddy v. Henry, 113 Iowa 462, 85 N. W. 771, 53 L. R. A. 769; Miles F. Bixler Co. v. Argyros, 206 Iowa 1081, 221 N. W. 828; McCormack v. Molburg, 43 Iowa 561; Dalhoff Const. Co. v. Block (C. C. A.) 157 F. 227, 17 L. R.A. (N. S.) 419; Crocker v. Manley, 164 Ill. 282, 45 N. E. 577, 56 Am. St. Rep. 196; Ripy v. Cronan, 131 Ky. 631, 115

S. W. 791, 21 L. R. A. (N. S.) 305; Pigott v. Graham, 48 Wash. 348, 93 P. 435, 14 L. R. A. (N. S.) 1176; Mabardy v. McHugh, 202 Mass. 148, 88 N. E. 894, 23 L. R. A. (N. S.) 487, 132 Am. St. Rep. 484, 16 Ann. Cas. 500; Rothermel v. Phillips, 292 Pa. 371, 141 A. 241, 61 A. L. R. 490; McCoun v. Nickell, 208 Ky. 20, 270 S. W. 457; Packard Machinery Co. v. Schweiger, 147 Wis. 67, 132 N. W. 606.

In Bell v. Byerson, 11 Iowa 233, on page 237, 77 Am. Dec. 142, we said:

"The fraud charged is, that the plaintiff made false statements to defendants as to the price of flour at Iowa City, by representing that he had come from certain flouring mills in that place, and that the price named in the contract was the market value in said city. It appears by the pleadings that the defendants were millers, engaged in manufacturing and selling flour; that they were doing business not far from said city, and where with reasonable diligence they could have ascertained the value of the commodity sold. The representations made, as thus alleged, were not of such a character as the defendants should have relied upon. Their means of knowledge were equal to those of the plaintiff, and where this is the case, the law will not interfere to protect the negligent."

In the case of Miles F. Bixler Co. v. Argyros, 206 Iowa 1081, 221 N. W. 828, 829, we said:

"It is a settled rule in this state that, if the means of knowledge of the alleged fraud were equally open to both parties, the law will not interfere to protect one who is negligent."

In the case of Packard Mach. Co. v. Schweiger, 147 Wis. 67, 132 N. W. 606, 607, the court said:

"Knowledge of the actual size of the exhibited bolt was readily open to the defendant by applying any simple and ordinary means of measuring it. Nor does the evidence tend to show that the defendant was hindered or prevented through artifice or otherwise from acquiring accurate knowledge of this fact. The conclusion is inevitable that the defendant failed to act with that care and prudence the situation demanded to inform himself on the subject of his purchase, and hence he cannot complain of having ordered a kind of bolt different from those he had theretofore used."

In the case of Rothermel v. Phillips, 292 Pa. 371, 141 A. 241, 243, 61 A. L. R. 490, the court of Pennsylvania said:

"The burden was upon plaintiff to show the making of a fraudulent representation of a condition, relied on to his injury. Here, the statement complained of was that the goods sold for $7,000 were worth $8,000. There was no evidence to show that defendants did not honestly believe this to be true, and, in the absence of such proof, the action of deceit falls. * * * If knowledge of the fact, claimed to have been misrepresented, is equally obtainable by either party on inquiry, and the buyer has been given full opportunity to determine the truth for himself, he cannot subsequently complain."

Pigott v. Graham, 48 Wash. 348, 93 P. 435, 438, 14 L. R.A. (N. S.) 1176, was a case in which a purchaser of corporate stock brought an action against the seller for fraudulent misrepresentations inducing him to enter into a certain contract. In this case the court says:

"Here it will be observed the parties were in the same kind of business, competitors in the printing business in the city of Seattle, both stockholders in the business, and stockholders and managers of their respective businesses. It was their knowledge of the business in all its details that prompted them to enter into this consolidation, so that money might be made thereby and expenses saved. The property was on hand, it was all in the city of Seattle, and it would have been but an act of the most common kind of prudence on the part of the appellant to have investigated the business and books of the concern, which he was practically buying. * * * Certainly there is no showing that he was prevented by any manipulation, fraudulent or otherwise, on the part of the Graham Company, from making such an examination."

In summing up that case the court says:

"If contracting parties were allowed, after making contracts and agreements with reference to business and property, and after discovering that their trade had not been a profitable one, to annul such contracts either by rescission or by actions for damages, it would render the business conditions of the country perilous and uncertain, make contracts unstable and unreliable, and keep the courts of the state busy in determining matters which ought to have been determined by the parties to the contract before they entered into the same."

Mrs. Ganzhorn and her partner, Mrs. Bradford, had been con-

nected with the college for several years. They were stockholders and during that time they attended all of the stockholders meetings. They had access to all the books of the corporation, they were connected with the college, were expert bookkeepers and teaching bookkeeping in the college. As stockholders they must have known what dividends were authorized and what dividends paid during that time. They were familiar with the business, and with ordinary diligence could have examined the books of the college, and could have easily obtained full information of the matters complained of.

Mrs. Ganzhorn says that Mr. Youngstrom told her the stock had all been paid. In addition to the means of information available to her, she knew this was not a fact because she herself still owed $1,500 on her own stocks. She says he told her the principal assets consisted of student notes. She knew this was not a fact. She knew the furniture and fixtures, books, typewriters, and other equipment of a business college were there. The inventory showed books valued at $468; accounts receivable at $135; furniture and fixtures at $7,320; typewriters $2,200; athletic equipment at $1,200; advertising material at $423; prepaid insurance $46; deposits on lights $25. She knew all this property was there.

Defendants operated the college from April, 1930. Between April and October they took in a large amount of money. During that time Mrs. Ganzhorn and Mrs. Bradford collected about $8,000 or $9,000 on student notes and tuition. In November they sold $1,000 worth of newly issued stock at par receiving $1,000 in cash therefor. During that time they sold off practically all of the old equipment and typewriters; they installed new fixtures and typewriters at a great expense; raised Mrs. Ganzhorn's salary from $80 to $200 per month and Mrs. Bradford's to $300 per month; they moved into new and more expensive quarters, and so conducted the business that the college later went into bankruptcy. When they took over the business in April, the monthly expenses were about $900; by September the expenses under the new management increased to $7,000 in that month. To say that they could wreck the business and then ask to have the notes and mortgage given as consideration therefor canceled would be an utter disregard of the equitable maxim required of the defendant "that he who seeks equity must do equity."

The books of the college showed that in April there were something over $38,000 worth of notes receivable, of which about $11,000 were written off; notes amounting to about $28,000 were turned over

to the defendant and her partner when they took over the business. This information must have been known or readily available to defendants.

The alleged representations that the notes were good and would pay at least 75 per cent on the dollar, and that they were reasonably worth from $27,000 to $30,000 were in the nature of an opinion upon which a claim of fraud cannot be based.

The statement that none of the notes were signed by minors was the statement of a fact known to or readily ascertainable by the defendants by the exercise of ordinary prudence. These matters were easily and readily ascertainable by defendants and readily obtainable by her. She knew this was a students college, and that a large number of the notes were student notes. She must have seen the notes when she bought them. If, as she says, they constituted the principal assets of the college, she must be held guilty of gross negligence in taking them over without looking at them. She was instructor and connected with the business for three years and knew that many of the students were minors.

The lower court found that the defendants failed to establish their defense of fraud. Upon the entire record we are disposed to acquiesce in the conclusion of the trial court that there was not sufficient evidence to establish the defense of fraud, and that the means of knowledge of the alleged fraudulent statements were equally available to both parties herein. The defendants were therefore not warranted in relying upon the statements alleged to have been made. It is therefore our finding that the defense of fraud has not been established.

After a careful review of the entire record in this case, we are confident that the ruling of the lower court was correct and its judgment and decree are therefore hereby affirmed.

KINDIG, C. J., and STEVENS, ANDERSON, and MITCHELL, JJ., concur.